UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE ESTATE OF DEBORAH HUSSEY, by Marion Hussey, in her capacity as Administratrix of the Estate of Deborah Hussey, and MARION HUSSEY,<br><br>           Plaintiffs,<br><br>v.<br><br>United States of America, et al.<br><br>           Defendants. | Civil Action No.: 03-10087 WGY |

**PLAINTIFF MARION HUSSEY'S OPPOSITION TO THE
UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

Plaintiff Marion Hussey, as the administratrix of the Estate of Deborah Hussey, and individually opposes the United States' Motion to Dismiss or, in the Alternative for Summary Judgment ("Motion to Dismiss"). The government argues it is entitled to dismissal because: (1) the discretionary function exception to the Federal Tort Claims Act ("FTCA") applies to the plaintiffs' claims; and (2) it had no special relationship with James Bulger ("Bulger") and Stephen Flemmi ("Flemmi") that imposed a duty to prevent criminal acts by Bulger and Flemmi. Although not framed as a renewed motion, most of these arguments have already been presented to and rejected by this Court. See Davis v. United States, 340 F. Supp. 2d 79 (2004).

# ARGUMENT

In previously rejecting the United States' argument on dismissal, this Court explained:

> More importantly, though, the government's method of attacking the legal sufficiency of the plaintiff's claims misses the mark. The plaintiff's claims against the United States do not simply arise from an ineffective promise of immunity or a particular decision not to protect or warn an individual. Instead, the plaintiff alleges that for decades, the FBI allowed—and in some instances even encouraged—Flemmi and Bulger to commit murder and other serious crimes. Flemmi and Bulger were allegedly able to carry out these criminal activities because the FBI used deception and its political weight effectively to insulate the two alleged gangsters from prosecution by other federal and state law enforcement authorities. According to the plaintiff, the FBI carried out its practice of protecting Flemmi and Bulger without any real regard to the foreseeable trial of victims, including Davis.

Id. at 85-86 (D. Mass. 2004).

Under the FTCA the government has waived its sovereign immunity and agreed to be sued for claims "for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

Plaintiff Marion Hussey alleges that the government's acts and omissions in protecting Stephen Flemmi ("Flemmi") and James Bulger ("Bulger") for decades caused her daughter's death. Specifically, Marion Hussey's Complaint alleges in paragraphs 3 to 5:

> 3. Plaintiff alleges that beginning in or about 1969 and continuing up to July 6, 2000, the federal defendants conspired to protect and shield from

>prosecution defendants Bulger, Flemmi, Weeks and other members of the so-called "Winter Hill Organized Crime Group" in exchange for Bulger's and Flemmi's agreements to provide information to aid the FBI in its prosecution of La Costra Nostra ("LCN") - Bulger's and Flemmi's competitors in the Boston, Massachusetts Organized Crime Market. It was the object of the conspiracy for the federal defendants to protect Bulger and Flemmi from arrest and prosecution in order to maintain their roles as high echelon informants, providing information to the FBI. The plaintiffs allege that the defendant United States and federal defendants knew or should have known that defendants Bulger and Flemmi were involved in violent criminal activity, including murder, extortion and assault, but despite this knowledge failed or refused to investigate Bulger's and Flemmi's criminal activity for purposes of prosecution because, if prosecuted, the federal defendants would lose Bulger's and Flemmi's services as informants.

>4. The Complaint alleges that the defendant United States continued to utilize Bulger and Flemmi as top echelon informants, even though they had been involved in approximately 23 murders, including at least two persons who were directly cooperating with the FBI at the time of their execution. Furthermore, the complaint alleges that the federal defendants failed to control the criminal activities of Bulger and Flemmi; failed to enforce the Attorney General Guidelines concerning high echelon informants; violated the Attorney General's Regulations and Policies by failing to inform appropriate law enforcement authorities of the criminal activities of Bulger and Flemmi; failed to properly supervise federal agents, including Connolly and Morris in their handling of Bulger and Flemmi as top echelon informants; and failed to investigate for purposes of prosecution the circumstances of Hussey's disappearance and death.

>5. By both error and omission and by direct misconduct certain Special Agents and Supervisory Agents of the FBI rendered themselves, their agency and the United States of America civilly answerable for multiple brutal deaths, including that of Deborah Hussey.

On these facts, as more fully developed in the Estate of Debra Davis' Statement of Material Facts, the discretionary function exception is inapplicable and the government cannot escape liability.

## I.  THE DISCRETIONAY FUNCTION EXCEPTION DOES NOT APPLY

The discretionary function exception precludes "[a]ny claim . . . based upon the exercise of or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion was abused."  28 U.S.C. § 2680 (a).  The government argues that this discretionary function exception "bars plaintiffs' claims insofar as they are based on a failure to protect their decedents from being harmed by Flemmi or Bulger[.]"  Memorandum of Points, p. 12.

The purpose of the discretionary function exception "is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, [and] when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy."  United States v. Gaubert, 499 U.S. 315, 322-323 (1991).  The reasoning behind the exemption is to prevent "seriously handicap[ping] efficient governmental operations."  United States v. Varig Airlines, 467 U.S. 797, 814 (1984).

The Supreme Court of the United States in Gaubert promulgated a two part test to determine if the exception applies.  First, the government's action must involve an element of choice.  "In other words, the conduct did not involve mandatory compliance with a particular federal statute, regulation or policy."  Crenshaw v. United States, 959 F. Supp. 399, 402 (S.D. Tex. 1997).  Second, the Court must make certain the conduct is "based upon considerations of public policy [and this evaluation must center] not on the agent's subjective intent in exercising the discretion, but on the nature of the actions

taken and on whether they are susceptible to policy analysis." Gaubert, 499 U.S. at 323, 325.

By attempting to frame the Hussey case as one of "protecting the public from crime," the United States seeks to hide behind the discretionary function exception. Memorandum of Points at 2, 10. However, as has been its pattern, the government "miss[es] the forest for the trees." Limone v. United States, 271 F. Supp. 2d 345, 349 (D. Mass. 2003) (denying Government's motion to dismiss). After denial of the United States' motion to dismiss in Limone, a twenty-two day bench trial before the Honorable Nancy Gertner with hundreds of exhibits ensued. Limone v. United States, 497 F. Supp. 2d 143, 151 (D. Mass. 2007).

In Judge Gertner's lengthy Memorandum and Order on the Bench Trial she held that the discretionary function exception did not apply because the "government agents strayed outside of the bounds set on their discretion by statute, Constitution, and their own rules and regulations." 497 F. Supp. 2d 143, 167. The words from this Court's Memorandum and Order in Limone could not be more directly on point:

> As my findings make clear, I do not find defendant liable under any claim based *solely* on the decisions to recruit Barboza and Flemmi, or *solely* on the failure to disclose exculpatory information. My findings are based on the totality of the FBI's conduct, of which those claims are only a part. That totality cannot remotely fit with the discretionary function exception without doing violence to everything for which our country stands.

Id. (Emphasis in the original.)[1]

---

[1] Judge Gertner's words are reminiscent of the words that John Adams spoke in 1776, which are carved into the façade of the John Joseph Moakley U.S. Courthouse in Boston: "The dignity and stability of government in all its branches, the morals of the people, and every blessing of society depend upon an upright and skillful administration of justice." To allow the government to argue protection under the discretionary function exception does not serve justice.

As Judge Gertner explained, no government employee has "'discretion' to violate the Constitution, statutes, regulations or rules that bind them [and where FBI agents] took illegal actions . . . they acted outside their discretion." Id. The government cannot rely upon the discretionary function exception when its agents violated FBI and/or Department of Justice rules and regulations. Id. at 168.

The Limone court cites some of the broken internal regulations. Id. at 168, n. 160. For example, the FBI rules state: "no employee shall engage in criminal, infamous, dishonest, immoral or notoriously disgraceful conduct or other conduct prejudicial to the Government." The FBI's Manual of Instructions provides that "[w]hile it is proper for the FBI to use informants in appropriate investigations, it is imperative that special care be taken not only to minimize their use, but also to ensure that individual rights are not infringed and that the government itself does not become a violator of the law." Id. (Citations omitted). To put it simply, the FBI's conduct was "illegal, unconstitutional and in violation of their own rules." Id. at 169. Such behavior does not merit the shield of the discretionary function exemption. This Court also found in Limone that the "FBI supervisors broke additional rules and exceeded their discretion when they failed to control or discipline their employees as they were committing those torts." Id. at 253.

Marion Hussey alleges the negligence of the government stems from the decades of its unholy alliance with Bulger and Flemmi in its insatiable quest to eradicate the LCN at any cost, not simply from the decision to use informants. As Judge Gertner explained and the Honorable Reginald C. Lindsay ("Judge Lindsay") endorsed, "this case is about much more than minutiae of discrete FBI decisions viewed in isolation." Id. See also Davis v. United States, 340 F. Supp. at 86. ("Similarly, in this case it is inappropriate to

anatomize and line-edit the plaintiff's claims as long as there are allegations supporting claims that bring the conduct of government employees within the ambit of the FTCA.")

In his Davis decision, Judge Lindsay pointed to dicta in Pooler v. United States, 787 F. 2d 868 (3rd Cir. 1986), which noted:

> If the issue was the use of an undercover agent or informant whose known tendencies toward violence suggest a risk of physical harm either to the targets of an investigation **or to all bystanders**, the case might well be different.

Id. at 871.  (Emphasis added.)

Other jurisdictions have similarly ruled that the discretionary function is not all encompassing.  In Liuzzo v. United States, 508 F. Supp. 923 (S.D. Mich. 1981), a civil rights worker was murdered when Klu Klux Klan ("KKK") members drove by and shot her.  Id. at 925.  An FBI informant, Gary Thomas Rowe, was in the KKK vehicle.  Id.  In rejecting the United States' assertion of the discretionary function exception to the FTCA, the court ruled:

> The discretionary function exception does not insulate the Government from liability for all mistakes of judgment of its agents, but only for significant policy and political decisions which should not be circumscribed by customary tort standards . . . but claims which arise out of the manner in which a particular situation is handled, and which are based on allegations that existing, valid regulations were wrongfully or negligently implemented are not so barred.

Id. at 931.

The Liuzzo court put it simply:  "FBI's implementation of policy with regard to Rowe's recruitment, training, supervision and instruction are not barred by discretionary function."  Id. at 933.  The analogy to Bulger and Flemmi is perfect.

In <u>Marin v. United States</u>, the INS did not prosecute and kept a felon/informant out of prison, just like the FBI did for Bulger and Flemmi.  <u>Marin</u>, 814 F. Supp. at 1469.  Upon his INS-arranged release from jail, the informant murdered a woman whom he had wanted to date.  <u>Id</u>.  Her estate brought a claim under the FTCA and the United States filed a motion to dismiss citing the discretionary function exception.  The Third Circuit denied the motion to dismiss and ruled that the use of a confidential informant is a discretionary function, but negligent supervision of an informant is not.  <u>Id</u>. at 1482.  The Court clarified that:

> for the discretionary function exception to apply, the United States must prove that each and every one of the alleged acts of negligence (1) involved an element of judgment; and (2) the judgment was grounded in social, economic or political policy.

<u>Id</u>. at 1483.

As outlined in great detail in the Estate of Debra Davis' Statement of Material Facts, which Marion Hussey incorporates herein, the FBI encouraged and assisted Bulger and Flemmi in committing murders, protected them from prosecution, kept them out of jail and violated numerous internal rules governing the handling of informants.  Marion Hussey makes particular reference to the following Sections in the Estate of Debra Davis' Statement of Material Facts;

- A 25 Year History of FBI Tips and FBI Protection for Bulger and Flemmi, ¶¶ 127 to 164;

- Murders by the FBI Informants, Bulger and Flemmi, ¶¶ 165 to 188;

- The FBI and Informants, ¶¶ 271-278 (outlining the Manual of Investigative Operations and Guidelines violations);

- Informant Guidelines, ¶¶ 286 to 295.

These acts and/or omissions do not fall within the parameters of the discretionary function exception and as Judge Gertner so aptly commented allowing the United States to invoke that exemption to the FTCA does "violence to everything for which our country stands."

The cases the government relies upon for dismissal are not close on the facts. In <u>Woods v. United States</u>, 2007 U.S. District LEXIS 80931 (D.N.J. 2007), an unpublished decision from the District Court of New Jersey, a confidential informant in a gang permitted a woman into the place where he lived, which was also the location of the gang. She was killed during a robbery. <u>Id</u>. at *2. The Court mentioned that the informant lived at the location and could allow whomever he wanted into his living space. <u>Id</u>. Also, the shooting was the result of a robbery and not related to his role as an informant. <u>Id</u>. Nor is there any allegation in <u>Woods</u> that the informant had any role in killing the victim.

The <u>Shuler</u> case, 531 F.3d 930 (D.C. Cir. 2008), is also dissimilar because it involves an informant suing the government for being shot. The informant argued the FBI's quick arrest of the investigation's target exposed him as the informant and resulted in the shooting. <u>Id</u>. at 203. The facts in another unpublished case cited by the government, <u>Carrion v. United States</u>, 1989 U.S. Dist. LEXIS 19180 (E.D. N.Y. 1989), lend no help to the government's request for dismissal. In that case witnesses who were previously informants were murdered on the eve of trial by the person against whom they would testify. <u>Id</u>. at *2. Nothing in any of the cases cited by the United States is remotely similar to the allegations in the Hussey Complaint.

As the discretionary function exclusion does not absolve the government of liability, the question of duty and foreseeability must be examined. For the reasons discussed below, the government owed Deborah Hussey a duty of care and her death was foreseeable.

## II.     GOVERNMENT HAD A DUTY TO PROTECT THE PLAINTIFFS

In the Davis decision, which already considered the arguments raised in this motion, Judge Lindsay rejected the United States' argument on lack of duty and ruled, "there are several theories under Massachusetts law by which the United States might be liable to the plaintiff for failing to warn or protect Davis from the criminal activities of Flemmi and Bulger." Davis, 340 F. Supp. 2d at 92-93. They are: (1) course of dealings between the FBI and Bulger and Flemmi "created a risk of danger to Davis and a concomitant duty to warn and protect Davis from the danger;" (2) special relationship between the FBI and Bulger/Flemmi created "a duty owed to the general public to control them;" and (3) by the FBI allowing Bulger/Flemmi to commit crimes "with impunity and not warning the foreseeable victims of those crimes, the government gave Flemmi and Bulger 'substantial assistance' in murdering Davis." Id. at 93.

This Court held that "[a] reasonable inference from the allegations of the amended complaint is that the United States had a 'special relationship' with Flemmi and Bulger and a **consequent duty to the general public to control the actions of these informants**." Id. at 91. (Emphasis added.)

This Court found that "Massachusetts law would likely impose a duty on a private person to protect another from the wrongful acts of third parties based 'on the existence of a special relationship between the negligent person and the person . . . to whom it is

sought to impose liability.'" Id. (citing Restatement (Second) of Torts, § 319: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing the same," and § 315: "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct.")

The Davis ruling also noted another theory of liability: joint liability or liability arising from aiding and abetting another in a wrongful act. Id. For this theory the Court referenced Massachusetts decisions imposing liability when a person "knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other," and Restatement (Second) of Torts, § 876[2]. Id. (Citations omitted.) Judge Lindsay cited favorably to Halberstrom v. Welch, 705 F.2d 472 (D.C Cir. 1983) and noted the Massachusetts Supreme Judicial Court cited Halberstrom with approval in Alberts v. Devine, 395 Mass. 59, 71 (1985). Id. In Halberstrom the court held a woman "civilly liable for a murder her boyfriend committed while burglarizing a home" even though she was not present at the murder because "she helped her boyfriend run the continuing criminal enterprise he was advancing at the time he killed the victim." Id. (Citations omitted.) The government's involvement with Bulger and Flemmi was much more elaborate than the girlfriend's role in Halberstrom.

---

[2] Section 876 of the Restatement (First) of Torts (1939) provides: Persons Acting in Concert. For harm resulting to a third person from the tortious conduct of another, a person will be liable if he: (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. (Section 876 (b) of the Restatement (Second) of Torts (1979) is virtually identical to the 1939 version of that subsection. Davis, 340 F. Supp. 2d. at 92, n. 12.)

Under Section 321 (1) of the Restatement (Second) of Torts (1965), "if an actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." Just like the defendants in Commonwealth v. Levesque, 436 Mass. 443 (2002), who accidentally started a fire, but then utterly failed to report it or control it, and several firefighters died, the FBI created a deadly hazard by empowering Bulger and Flemmi to commit any crime with impunity and failing to control them. As Judge Lindsay stated in Davis, "if an individual can be criminally liable for failing to mitigate a hazard of his own creation that results in death, it follows that he also can be subject to civil liability in those circumstances." Davis v. U.S., 340 F. Supp. 2d at 90.

The Honorable William G. Young found Judge Lindsay's "reasoning in Davis . . . convincing in the context of murder," but did not apply it to a claim for emotional distress. Rakes v. United States, 352 F. Supp. 2nd 47, 58 (2005). The decision in Rakes was that Section 321 (1)[3] requires behavior that creates "an unreasonable risk of causing physical harm," and it was uncertain if the Supreme Judicial Court would impose such a duty for a claim for emotional distress related to the extortion of a liquor store. Id.

In its motion to dismiss or for summary judgment the United States cites from McCloskey v. Mueller, 446 F.3d 262 (1st Cir. 2006), but startlingly misses the most salient point. The First Circuit's decision makes clear that it endorsed Judge Lindsay's reasoning in the Davis decision and would affirm his ruling that "a special relationship between the government and its informants created 'a duty owed to the general public to control them.'" Id. at 270, n. 9 (citing Estate of Davis v. United States, 340 F. Supp. 2d

---

[3]   Assuming Massachusetts recognizes the Section 321 (1) exception.

79 (D. Mass. 2004)).  The reason the First Circuit upheld the dismissal of the McCloskey's lawsuit was the contact with the FBI was so minimal, just one telephone call, as opposed to a decades long relationship in which the FBI protected Bulger and Flemmi, their top echelon informants.

On July 23, 2001, Gary Sampson telephoned the Boston office of the FBI to turn himself in on charges of armed robbery.  Id, at 264.  The FBI employee mistakenly or otherwise disconnected Sampson and made no efforts to retrieve the call.[4]  Id.  Sampson spent "several hours fruitlessly awaiting the FBI's arrival," and, tragically when the FBI failed to arrive, started a "killing spree."  Id. at 265.  Sampson murdered Philip McCloskey on July 24, 2001 and two other victims before the week ended and the authorities arrested him on July 31, 2001.  Id.

The McCloskey family filed a FTCA claim against the FBI.  Id.  In considering the United States' motion to dismiss, the United States Court of Appeals for the First Circuit ("First Circuit") explained there are exceptions to the general rule that a person does not have a duty to control a third party to prevent him or her from harming others. Id. at 267.  One of those exceptions deals with the situation when "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct."  Id. at 268 (citation omitted.)  The Court continued: "In the same vein, one may acquire a duty to control a third person if he 'takes charge' of that person and 'knows or should know [that the third person is] likely to cause bodily harm to others if not controlled."  Id. (citations omitted.)

---

[4] At first the FBI employee, William Anderson, lied by denying that there was a call from Sampson, but eventually admitted that the telephone call occurred.  Id. at 265.

Even with just one brief telephone call between the FBI and Sampson the First Circuit paused and considered if the telephone call created a duty, noting "the relationship between Sampson and Anderson [the FBI employee who disconnected the call] is not quite so easily dismissed." Id. at 269.  Ultimately the Court found the "solitary link . . . inadequate to give rise to a duty on Anderson's part to control Sampson," and ruled Sampson and the FBI were not in a "sustained relationship." Id. The First Circuit also considered whether by that one telephone call the FBI "took charge" of Sampson in such a manner to impute a duty to the FBI to control him.  Again, the Court determined there was not a sufficient nexus, but only a "fragile connection," which was "too amorphous a foundation on which to erect a duty to control." Id. at 269-270.

The First Circuit had ample opportunity in the McCloskey decision to reject Judge Lindsay's holding in Davis v. United States that the relationship between that FBI and its notorious informants created "a duty owed to the general public to control them." Instead, the First Circuit embraced Judge Lindsay's reasoning by considering if the one phone conversation rose to a level resulting in a duty.

Here, one does not have to guess how the First Circuit will rule on Judge Lindsay's previous denial of the United States' motion to dismiss.  The decision in McCloskey provides the emphatic answer.

### III.     IT WAS FORESEEABLE THAT BULGER AND FLEMMI WOULD HARM OTHERS

The United States did not need to foresee the exact harm (i.e., that Deborah Hussey would be murdered); it is sufficient that the events were in the scope of foreseeability.  Williams v. United States, 450 F. Supp. 1040, 1046 (D. S. Dakota. 1978) ("[T]he harm suffered must be found to be a foreseeable consequence of the act complained of.  This does not mean, of course, that the precise events which occurred could, themselves, have been foreseen as they actually occurred; only that the events were within the scope of the foreseeable risk.")  See also Flood v. Southland Corporation, 33 Mass. App. Ct. 287, 298-299 (1992) (Defendant need not foresee the manner in which a customer might be harmed.  It is enough that defendant should have "realized that there was preventable real danger to its patrons.")

The Williams court found a Veterans Administration hospital liable under the FTCA for failing to notify the sheriff of the release of a psychiatric patient after agreeing to do so.  Id. at 1041.  Upon his release the patient got into an altercation with a stranger, shot and killed him.  Id. at 1040.  In finding the hospital responsible, the Court cited the following section from Prosser, Law of Torts:

> The defendant's special responsibility may arise because he is in a position to control the criminal himself so is held to be under an obligation to do so, extending to anyone who may be injured by his failure to exercise reasonable care.

Prosser, Law of Torts, ch. 5, p. 175 (4th ed. 1971).  The Williams Court concluded that "in light of [the patient's] history of violence, it was entirely foreseeable that he might make a violent, even fatal attack upon another."  Id. at 1046.

Some of the highlights, or more appropriately lowlights, of what the FBI knew about Bulger and/or Flemmi history of violence before Deborah Hussey's murder in 1984 are chronicled below, and more fully in the Estate of Debra Davis' Statement of Material Facts:

- On August 16, 1965 Flemmi, Frank Salemme, Wimpy Bennett and Howie Winter participated in the attempted murder of Edward "Punchy" McLaughlin with rifles.  (Davis Statement of Material Facts, ¶ 7.)

- Agent Rico told Flemmi that Edward "Punchy" McLaughlin was taking the bus on Spring Street in West Roxbury every day to go to watch his brother's criminal trial in Boston. (Id. at ¶ 9.)

- Flemmi used the information provided by Agent Rico and on October 20, 1965 shot and killed McLaughlin.  (Id. at ¶¶ 10-11.)

- Flemmi and Salemme left Boston for a week or two after the McLaughlin murder. Upon his return Flemmi spoke to Rico and Rico stated to him, either "Good shooting," or "Nice shooting."  (Id. at ¶ 12.)

- In 1967 Edward Wimpy Bennett was murdered by Flemmi. (Id. at ¶ 23.)

- In 1968 Attorney John Fitzgerald was gravely injured when a bomb placed by Flemmi and others exploded under his vehicle.  (Id. at ¶¶ 24-25.)

- In 1969 Agent Rico warned Flemmi of the indictment for the murder of Bennett and the attempted murder of Fitzgerald and Flemmi fled the jurisdiction.  (Id. at ¶ 26.)[5]

---

[5] As the Honorable Mark L. Wolf proclaimed at the August 21, 2001 sentencing hearing for Stephen Flemmi on racketeering charges: "Future trials will determine if Mr. Flemmi is proven to be a murderer.  But I will say this today, . . . If Mr. Flemmi has committed any of the crimes with which he remains charged, **he was able to do so largely because of the protection of the Federal Bureau of Investigation.**  It is clear to me that Mr. Flemmi would have either been killed or in prison like Frank Salemme if Paul Rico had not tipped him off and encouraged him to flee just before Mr. Flemmi was indicted for the bombing of John Fitzgerald and the murder of Walter Bennett. . . . [I]f Mr. Flemmi had been prosecuted in 1969 for the Fitzgerald bombing or the William Bennett murder, his role as an FBI informant might have been disclosed and examined more than 30 years ago.  But Mr. Rico prevented that from happening."  (Emphasis added.)

- Flemmi fled to Montreal and once there made contact with Rico, who told him that: "This will take some time to work out." (Id. at ¶ 29.)

- In 1974 Rico told Flemmi it was now time to return to Boston. (Id. at ¶ 30.)

- Although Salemme was convicted of the Fitzgerald bombing and spent in excess of fifteen years in prison, all of the charges against Flemmi were dropped. (Id. at ¶¶ 31-32.)

- Bulger was repeatedly referred to as a vicious individual and a vicious animal in the files of the Boston Office. (Id. at ¶ 53.)

- In December 1976, John Connolly informed Bulger that Castucci was an informant for the FBI and Bulger decided to murder Castucci. (Id. at ¶ 82.)

- On or about December 30, 1976, Matorano called Castucci and told Castucci to come to the garage in Somerville to pick up some money. When Castucci arrived, Matorano gave him a bag of money and sent Castucci to a nearby apartment with Bulger and Flemmi to count it. Matorano followed soon after and shot Castucci in the head while Castucci was seated in the kitchen. Matorano left the apartment, and Bulger, Flemmi and others disposed of the body. (Id. at ¶ 83.)

- Roger Wheeler was the owner of World Jai Lai ("WJA") a business that operated in Florida and Connecticut. John Callahan was a CPA who associated with gangsters and members of Winter Hill. (Id. at ¶ 106.)

- Callahan, Bulger, Flemmi and Martorano agreed that because Wheeler was "difficult" and could not be persuaded to sell WJA he had to be killed. (Id. at ¶ 112.)

- Flemmi re-contacted Rico and determined that Rico did in fact agree with the killing of Wheeler. Flemmi also learned that Rico was going to provide some personal information as to Wheeler's activities in Oklahoma that would assist the Winter Hill gang in locating and killing Roger Wheeler. (Id. at ¶ 114.)

- Matorano shot and killed Wheeler on May 27, 1981 outside his Tulsa golf club.  (Id. at ¶ 119.)

- On the day of the Wheeler shooting Flemmi contacted Bulger who stated that he had just spoken with Agent Connolly. Connolly stated to Bulger, "No one can say you did the shooting, I'd be your alibi." Flemmi stated that he was present when Agent Connolly confirmed aspects of this telephone conversation with Bulger that had taken place on the day of the Wheeler murder.  (Id. at ¶ 120.)

- Debra Davis, a known girlfriend of Stephen Flemmi, is reported missing in mid-September of 1981, and the Randolph Police Department entered Ms. Davis as a missing person in the National Crime Information System ("N.C.I.C."), which is administered by the FBI, on October 8, 1981.  Debra Davis was subsequently removed as a missing person from NCIC on March 29, 1982.  (Id. at ¶¶ 205, 221.)

- In or about April 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered Walter Bennett.  (Id. at ¶ 166.)

- On or about December 23, 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered William Bennett. (Id. at ¶ 167.)

- On or about December 23, 1967, in the Commonwealth of Massachusetts, Flemmi and others murdered Richard Grasso. (Id. at ¶ 168.)

- On or about March 8, 1973 in the Commonwealth of Massachusetts Bulger and others murdered Michael Milano. (Id. at ¶ 169.)

- On or about March 19, 1973, in the Commonwealth of Massachusetts Bulger and others murdered Al Plummer. (Id. at ¶ 172.)

- On or about March 24, 1973, in the Commonwealth of Massachusetts Bulger and others murdered William O'Brien. (Id. at ¶ 175.)

If these multiple murders listed above and other violent acts were not enough to put the FBI on notice of Bulger's and Flemmi's ability to kill on a

18

whim, after Debra Davis disappeared in 1981, the following people with direct links to the FBI were killed:

- Agent John Morris divulged to Agent John Connolly that Brian Halloran told the FBI that Bulger and Flemmi asked him to murder Roger Wheeler, which Connolly relayed to Bulger.  McIntyre, 307 F.3d at 46;

- In May of 1982 Bulger murdered Brian Halloran and David Donahue because Halloran began cooperating with the FBI in January of 1982 about Roger Wheeler's 1981 murder.  Id. at 40;

- August of 1982, John Callahan found murdered in the trunk of his car at the Miami airport.  Callahan, 426 F.3d at 447.

- In 1983 Barrett is murdered by Bulger and Flemmi.  Barrett v. United States, 462 F.3d 281 (1st Cir. 2006);

- On October 17, 1984 the FBI interviewed John McIntyre and in November of 1984 Bulger and Flemmi murdered him.  McIntyre, 307 F.3d at 42;

Even if one could put on blinders and believe Flemmi that it would be "unthinkable" to discuss murder with law enforcement, given the fact that potential informants against Bulger and Flemmi, including Halloran, Castucci and McIntyre were murdered shortly after sharing information with the FBI it is impossible for the United States to argue in good faith that it did not know Bulger and Flemmi were murderers.  At a minimum turning a blind eye is consent to murder as a solution to Bulger's and Flemmi's problems.

What is worse--the FBI condoned this method of problem solving and even encouraged it.  The FBI knew or should have known that anyone in Bulger's and Flemmi's path who presented a problem could be harmed, even killed.  Unfortunately for Deborah Hussey she was one of those people.  Evidently, it was the price the government

19

was willing to pay to use Bulger and Flemmi as top echelon informants against the LCN. This Court in rejecting the United States' motion to dismiss will send a clear message that the price was too high.

## **CONCLUSION**

Plaintiffs, the Estate of Deborah Hussey and Marion Hussey, respectfully request that the Court deny the United States' Motion for Dismissal, or in the Alternative, for Summary Judgment and enter judgment in their favor declaring that the discretionary function exception does not apply and the FBI's special relationship with Flemmi and Bulger imposed a duty on the FBI to prevent their criminal activity, including the murder of Deborah Hussey.

```
                                        PLAINTIFFS
                                        By their attorney,

                                        /s/ Ann M. Donovan
                                        Ann M. Donovan
                                        BBO # 552819
                                        Law Office of Ann M. Donovan
                                        1087 Beacon Street, Suite 204
                                        Telephone:    (617) 965-3222
May 19, 2009                            Facsimile:    (617) 965-1069
```