## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Anna M. Litif, *et al.* | )<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 02-11791-WGY |
| United States of America, *et al.* | )<br>) |
| Defendants. | ) |
| The Estate of Deborah Hussey, *et al.*, | )<br>) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 03-10087-WGY |
| United States of America, *et al.* | )<br>) |
| Defendants. | ) |
| The Estate of Debra Davis, *et al.*, | )<br>) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 02-11911 WGY |
| United States of America, *et al.*, | )<br>) |
| Defendants. | ) |

### UNITED STATES' TRIAL BRIEF ON STATUTE OF LIMITATIONS

#### Background

The Davis and Hussey plaintiffs have filed trial briefs in support of their argument that the statute of limitations on the claims of those plaintiffs did not accrue until the killers of their decedents confessed to the crime. The most striking aspect of these briefs is that plaintiffs have failed to cite a *single* case, from this or any jurisdiction, which supports their unprecedented evasion of limitations law. Moreover, there is ample case law support for the contrary

conclusion, as detailed in the United States Renewed Motion to Dismiss, Docket #113. *See, e.g., Gonzalez-Bernal v. United States*, 907 F.2d 246, 248-249 (1st Cir. P.R. 1990) ("Plaintiffs argue that even in the exercise of due diligence they could not have discovered that Customs agents were the responsible parties within two years of Lajam's death, and that the statute should begin during the year of the indictment. Furthermore, they contend that it is beyond human comprehension to argue that they had reason to even remotely suspect, or with due diligence could have discovered, that Government agents had caused Lajam's death. Appellants argue that it is ludicrous for them to have been expected to prosecute their claims two and a half years before the indictments were issued against [the killers]. We sympathize with appellants' situation, but unfortunately, precedent dictates that we rule otherwise.")

      The plaintiffs' briefs attempt to argue that the death of their decedents was 'inherently unknowable' until the confessions of Kevin Weeks and Stephen Flemmi, and provide a step-by-step guide illustrating how a plaintiff 'buries her head in the sand.' In particular, the Hussey Plaintiffs argue that, because there was no mention of Deborah Hussey in the avalanche of media coverage or the Salemme opinion, her death at the hand of Stephen Flemmi was inherently unknowable. The Davis Plaintiffs, whose knowledge that Flemmi killed Debra Davis shortly after the murder is a matter of public record,[1] speculate that even if a duty to inquire had arisen, such an inquiry would have been fruitless because the government had no conclusive information about the killing until the Flemmi confession. Both arguments collapse upon consideration of an important fact – the Davis and Hussey families were not innocently ignorant of Flemmi and his conduct. Indeed, they were intimate accomplices and beneficiaries in his life of crime.

      Moreover, had the families reported what they actually knew of Flemmi and his

---

[1] *See e.g.,* media articles included in appendix to the United States dispositive motions.

2

involvement with the decedents to law enforcement, or even the media, then the course of the investigation, and what was "inherently unknowable' would have surely changed. In essence, these plaintiffs argue that their nurturing and protecting of Flemmi before the murders, and their silence and inaction after the murders, is somehow a virtue on which they now rely to argue that the essential facts of the murder were unknowable at the critical times, thereby saving their claims from the limitations bar. As a matter of law and public policy, the Court must reject this argument.

## Argument

### I. Legal Standard

It is well-settled that the United States, as sovereign, is immune from suit save as it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *United States v. Testan*, 424 U.S. 392, 399 (1976); *Skwira v. United States*, 344 F.3d 64, 72 (1st Cir. 2003), *cert. denied*, 124 S. Ct. 2836 (2004). A waiver of the federal government's sovereign immunity "cannot be lightly implied, but must be unequivocally expressed," *United States v. Mitchell*, 445 U.S. 535, 538 (1980), and such a waiver "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). *See also Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986); *McMahon v. United States*, 342 U.S. 25, 26 (1951); *Skwira*, 344 F.3d at 73.

The Federal Tort Claims Act (FTCA) provides a limited waiver of sovereign immunity, making the United States liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Where the FTCA applies, the United States may be liable for

certain torts "in the same manner and to the same extent as a private individual under like circumstances." *Id.* at § 2674.

The FTCA, however, "carefully circumscribes that waiver" and "[o]ne of the many constraints placed on it is a statute of limitations." *Skwira*, 344 F.3d at 73. "As with all waivers of sovereign immunity, the Supreme Court has warned that this limitation * * * must be strictly construed." Id. (*citing United States v. Kubrick*, 444 U.S. 111, 117-18 (1979)). If "strictly construed" means anything, it means that an unprecedented tort theory under state law cannot be sustained for the first time in an FTCA case.

The FTCA's statute of limitations provides in relevant part: "A tort claim against the United States shall be forever barred unless it is presented to the appropriate Federal agency within two years after such claim accrues..." 28 U.S.C. § 2401(b). Thus, an FTCA claim will be time-barred unless the plaintiff has filed an administrative claim with the appropriate government agency within two years of the tort's accrual. *See Coska v. United States*, 114 F.3d 319, 322 (1st Cir. 1997). It is well-settled that failure to comply with that section's requisites warrants dismissal. *See, e.g., Gonzales v. United States*, 284 F.3d 281,288 (1st Cir. 2002); *Coska*, 114 F.3d at 322; *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir. 1992); *Gonzalez-Bernal v. United States*, 907 F.2d 246, 248 (1st Cir.1990). This Court repeatedly has held that compliance with this statutory requirement is a jurisdictional prerequisite to suit that cannot be waived. *See, e.g., Skwira*, 344 F.3d at 71; *Coska*, 114 F.3d at 323, n. 8; *Gonzalez-Bernal*, 907 F.2d at 248.

The general rule under the FTCA is that "a tort claim accrues at the time of the plaintiff's injury." *Kubrick*, 444 U.S. at 120. *See Skwira*, 344 F.3d at 73; *Gonzales*, 284 F.3d at 288; *Attallah*, 955 F.2d at 779; *Gonzales-Bernal*, 907 F.2d at 249. Thus, under the traditional rule,

plaintiff's cause of action would have accrued at the time of the Davis and Hussey decedents deaths in 1981 and 1984. *See* Restatement (Second) of Torts, § 899 (1979) ("A cause of action for death is complete when death occurs").

In certain cases - - originally involving medical malpractice or some other form of hidden injury - - the courts have recognized an exception to the general time-of-injury rule known as the "discovery rule" under which the tort claim accrues when the injured party knows both the existence and the cause of his injury." *See, e.g., Kubrick,* 444 U.S. at 113; *Gonzales*, 284 F.3d at 288. Recently, courts, including this Circuit, have extended the discovery rule beyond the context of medical malpractice and latent injuries to include wrongful death actions, such as the instant case, however, in none of those cases did the Court find that the accrual was tolled until the time the killer confessed. *See Skwira*, 344 F.3d at 74-75 (and discussion and cases cited therein); *Cascone v. United States*, 370 F.3d 95, 104 (1st Cir. 2004); *McIntyre v. United States*, 367 F.3d 38, 52 (1st Cir. 2004).[2]

This Circuit has held that, "outside the medical malpractice context, a claim accrues under the FTCA once a plaintiff knows, or in the exercise of reasonable diligence should know, (1) of her injury and (2) sufficient facts to permit a reasonable person to believe that there is a causal connection between the government and her injury." *Skwira,* 344 F.3d at 78. *See Cascone*, 370 F.3d at 104 (the test of accrual is when a "plaintiff knows, or in the exercise of reasonable diligence should have known, the factual basis of the cause of action, including the fact of the

---

[2] While this Circuit has held that the "discovery rule" applies in wrongful death cases, the question remains open in the Supreme Court (see *Rotella v. Wood*, 528 U.S. 549, 555 (2000) (emphasizing that it is in the context of "medical malpractice where the cry for a discovery rule is the loudest"); *TRW Inc. v. Andrews*, 122 S. Ct. 441, 446 (2001) (same).

injury and the injury's causal connection to the government") (citation omitted).

The First Circuit has emphasized the "reasonable diligence" component to this knowledge requirement, stressing that a plaintiff may not "bury her head in the sand." *Id.* (quoting *Diaz v. United States*, 165 F.3d 1337, 1339 (11th Cir. 1999)). If a plaintiff "fails to undertake a reasonably diligent investigation into the cause of injury, the law will impute to her an awareness of any knowledge that she would have uncovered if she had undertaken that inquiry." *Skwira*, 344 F.3d. at 77. The Court has held repeatedly that the test for accrual is "an objective one." *McIntyre*, 367 F.3d at 59. *See Cascone*, 370 F.3d at 104; *Gonzales*, 284 F.3d at 288.

Finally, "**while the required 'knowledge' that triggers accrual may not provide an adequate basis for an immediate lawsuit**, it must be sufficient to 'arm[]' the plaintiff 'with the facts about the harm done to [her]' such that she 'can protect [her]self by seeking advice in the * * * legal community.'" *Kubrick*, 444 U.S. at 123 (emphasis added). *See Skwira*, 344 F.3d at 84-85) ("a plaintiff is not entitled to wait until all of the facts in support of the claim are known. Rather, once the plaintiff knows enough to provoke a reasonable person to inquire further, the plaintiff has a duty to investigate"). Once the claim accrues, the plaintiff then has two years to present her administrative claim. 28 U.S.C. § 2401(b).[3]

---

[3] To facilitate the filing of administrative claims against government agencies, the Department of Justice has developed a standardized form, SF-95, which satisfies the statute's notice of claim requirement. A potential claimant has two years after her claim accrues to complete and submit this two-page form. *See* 28 C.F.R. § 14.2(a). This Court recently has noted that the burden of preparing this form is "minimal." *See Skwira*, 344 F.3d at 70 (citing *Santiago-Ramirez v. Sec'y of Dept. of Def.*, 984 F.2d 16, 19 (1st Cir.1993)).

## II.     The Suit Filed by the Family of Deborah Hussey is Time-Barred

Deborah Hussey was killed by Bulger and Flemmi in January 1985. The administrative claim based on her death was filed on January 11, 2002. Marion Hussey and Deborah Hussey's siblings lived in the Boston area. Mrs. Hussey claims she lived with Stephen Flemmi as husband and wife from 1960 to 1982, though he contended in his trial testimony in this matter that the relationship continued up until he went to jail in 1995. Marion Hussey bore three children by Flemmi. She was aware of his criminal activities and was a beneficiary of his criminal enterprises.

Marion Hussey does not dispute that she read the media accounts in 1997 stating that her common law husband had been an FBI informant. She even kept a scrapbook of the articles referencing her husband and produced it at her deposition, along with an index of the more than 50 news articles in her collection going back to 1995. Mrs. Hussey has confirmed that she was aware Mr. Flemmi was an FBI informant by November 1998 at the latest.

The Hussey plaintiffs do not dispute that the second element of the accrual analysis, the government connection to Bulger and Flemmi was met by the media barrage in 1997-1998 reporting the claim that the government allowed Bulger and Flemmi to get away with murder. They claim, however, that since the body of Deborah Hussey was buried in an unmarked grave, and Flemmi denied the killing until his confession in 2000, then the first element of the analysis, knowledge of the injury, fails. The Hussey plaintiffs claim that a reasonable person, with the knowledge available to the Hussey family, would not have suspected that Flemmi killed Deborah Hussey until Flemmi confessed to the murder. They make this claim notwithstanding that Marion Hussey did in fact believe, in 1986, that Stephen Flemmi murdered Deborah Hussey.

They now assert, apparently, that this belief, though true, was unreasonable, and that her later claim to believe that she was not dead, though wrong, was reasonable.

Even if the Hussey plaintiffs could convince the Court that Marion Hussey's belief in 1986 that Stephen Flemmi killed Deborah Hussey was unreasonable, though true, and her subsequent claims to disbelieve it are true, Plaintiffs' argument still cannot succeed. They claim that even the police did not know who killed Deborah Hussey before Weeks and Flemmi confessed so, therefore, it is reasonable for Marion Hussey to not believe it. However plaintiffs argument fails because the lack of information about the killer among law enforcement regarding Deborah Hussey's death was a result of the inaction and overt protection of Stephen Flemmi's role in the disappearance and death by Marion Hussey and her family.

Marion Hussey, Stephen Flemmi's common law wife of 30 years, testified at deposition that the suspicious circumstances surrounding Deborah Hussey's disappearance in late 1984, and the fact that she had not heard from her daughter in more than two years, led her to conclude in 1986 that Flemmi had killed her. That knowledge did not cause her to file a report with the police or any other official authority at the time. She remained mute, just as she did throughout Flemmi's life of crime with her, to protect him. Later she claims to have disbelieved her initially-correct conclusion that Flemmi killed Deborah and alighted on the notion that Deborah was living elsewhere. She asked Joseph Saccardo, a friend and police officer, to informally look for Deborah, though, as he testified in this trial, she failed to tell Saccardo of the emotionally traumatic last events before Deborah's disappearance – Deborah's disclosure that Flemmi had been having sex with her for years.

The Court has received the testimony of Mr. Saccardo and he described the efforts he

took to locate Deborah. His investigation found no trace of Deborah anywhere, though he learned from his sources that his questions about her did cause much concern among gangsters in South Boston. As he testified to this Court, his investigation, combined with the suspicious circumstances of her family relationships (even absent knowledge of the sexual disclosure) led him – a reasonable person in the position of Marion Hussey, though with far less knowledge than her– to conclude that Deborah Hussey was dead. That was in 1986. Certainly the fact that no one heard from Deborah at all for the next 15 years would have provided no basis for disbelieving that conclusion. In fact, each passing month and year in which the family continued to hear nothing from Deborah would be additional proof that Marion Hussey's initial conclusion was right – that Stephen Flemmi had killed her. And yet Marion Hussey and her family did nothing to initiate an investigation or to even file a missing persons report. At any time. So the fact that law enforcement did not know the killer until Flemmi confessed was a direct result of the Hussey family's failure to report what they knew to be true as far back as 1986.

While Marion Hussey may wish to bury her head in the sand, the facts and law do not allow it.

**II.     The Suit Filed by the Family of Debra Davis is Time-Barred**

Debra Davis was killed by Bulger and Flemmi on September 17, 1981. Her administrative claim was received on September 17, 2001. Olga Davis resided in Boston area from the time she was two years old. Deposition/Trial testimony of Olga Davis, p. 6-7. So too, have her children, the other statutory beneficiaries.[4] Id., p. 7-18. Moreover, she grew up with

---

[4] The knowledge of any family member is imputed to the estate's administrator. *Cutting v. United States*, 204 F. Supp. 2d 216, 227 (D. Mass. 2002); *Bennett v. United States*, 429 F. Supp. 2d 270, 278 (D. Mass. 2006) ("Thus the discovery rule does not require recalculation of the statute of limitations in light of the subjective knowledge, or ignorance, of each potential plaintiff. The [discovery rule] exception [to the general accrual rule] applies only when the cause

Stephen Flemmi and was well aware of his criminal lifestyle. Id., p. 39-40, 47. She even suspected that he had killed her first husband Edward Davis in 1975, and her son Ronald Davis on March 17, 1981, after each had voiced objections about Flemmi's relationship with Debra Davis. *Id.*, p. 47, 59-65, 188-191. She was well aware of the media publicity regarding the Flemmi-FBI scandal because she and her family were quoted in several articles.[5]

    The Davis family argues that, while they may have suspected that Flemmi killed Debra, if they had filed a lawsuit before Flemmi's confession, it would have been dismissed and perhaps caused them to incur Rule 11 sanctions. This claim completely misapprehends the process of asserting a claim under the FTCA. A lawsuit alleging a cause of action under the FTCA cannot be filed until after the filing of an administrative claim. The purpose of this requirement is to trigger an *investigation* of the claim. 28 U.S.C. § 2401. Here, of course, the Davis plaintiffs did not file their administrative claim until September 17, 2001, thirty years to the day after she was last seen. Similarly, while Olga Davis did file a missing persons report with the Randolph Police Department, she failed to tell them the important fact that the last person Debra was seen with before her disappearance was none other than Stephen the Rifleman Flemmi.[6] Other than filing

---

of action is inherently unknowable,' . . . not when it merely happens to be unknown by a particular potential plaintiff.").

   [5] Joe Heaney, Lost woman's kin need Mob answers; Flemmi's girlfriend vanished without a trace 17 years ago, THE BOSTON HERALD, December 10, 1998, Exhibit 6; Shelly Murphy, Search for Flemmi's ex-girlfriend; Police to look for her remains beneath Roxbury building, THE BOSTON GLOBE, December 11, 1998, Exhibit 7; Joe Heany and Ann Donlan, Cops plan search for body in cellar of old mob hangout, THE BOSTON HERALD, December 10, 1998, Appendix to this Motion.

   [6] Q: Did you tell the Randolph police that the last person that Debra was known to be with before her disappearance was Stephen Flemmi?
     A: No. I didn't say nothing.
     Deposition/Trial testimony, p. 102-103

this one report, Olga Davis did nothing. She did not follow-up with the Randolph Police Department, nor did she make any additional reports as the days and months passed.

When the FBI initiated talks with her about her daughter's disappearance, she also declined to tell them the last person Debra was seen with was Flemmi.[7] She further testified to her irritation that they kept asking about Stephen Flemmi and their suggestion – obvious to a reasonable person with the facts then available – that Flemmi may have killed her (as Victor Davis believed immediately). *Id.* p. 109. As a result, Olga Davis refused to continue to talk to them.

>   Q: So when they would, in these subsequent meetings when they would ask you these questions about Stephen Flemmi, you were getting irritated, I think. Is that fair to say?
>   A: That's fair to say.
>   Q: And you told them that you don't know anything about Stephen Flemmi; is that right?
>   A: Well, I didn't.
>   Q: But that's what you told them?
>   A: Yeah.
>
> * * *
>
>   Q: It also says that Agent Cronin says that Olga Davis – that you told him that you thought that Flemmi had killed your husband years prior to --
>   A: I never said that to the FBI, never, never, never never did I. They stopped seeing me because I wouldn't say anything.

Olga Davis Deposition/Trial Testimony, p. 107, 180

This testimony, in the context of the other relevant facts,[8] makes it clear that, but for the

---

[7] Q: But you didn't tell them that the last person she was seen with was Steve Flemmi?
A: I don't remember saying that.
Deposition/Trial testimony, p. 107.

[8] For example, Flemmi testified in this trial that Steven and Mickey Davis were drug dealers who were ordered to pay rent to Flemmi and Bulger and, further, that Mickey Davis had traveled with him to Haiti in 1981.

11

failure of Olga Davis and her family to come forward to the police with what they knew about Flemmi's role at the time of Debra Davis disappearance (which would have also been self-incriminating), the ensuing events would have transpired much differently. It is unseemly that the Davis family now relies on the ignorance of the facts available to law enforcement – when they were withholding those critical facts themselves.

In *Cutting v. United States*, 204 F. Supp. 2d 216 (D. Mass 2002), a suit alleging wrongful deaths of patients at a VA hospital caused by a VA nurse who injected them with a lethal dose of a drug. The plaintiffs, like the instant plaintiffs, contended that the statute of limitations started when the nurse was indicted. The court addressed the issue as to how much knowledge is needed to trigger accrual:

> On the one hand, some indication at least of the defendants responsibility, must be available. On the other hand, the discovery rule puts a burden on plaintiffs to investigate once they have some reason to suspect foul play; accrual may occur long before there is a firm confirmation of the defendant's probably culpability.

*Id.* at p. 224-225.

Here both the Davis and Hussey families believed early on that Flemmi was probably responsible for the deaths of their decedents. That alone is sufficient to trigger accrual upon the deluge of media articles in 1997 asserting that the FBI had given Flemmi a license to murder.[9] Their failure to inquire further, or to even report what they knew to law enforcement, is inexplicable and surely does not extend the statute of limitations on their claims.

---

[9] Indeed, Flemmi testified that he told Debra Davis of his corrupt relationship with the FBI before he killed her in 1981, and that she repeated this fact in front of one of her brothers before her death. So, the Davis family was on notice of the corrupt relationship between Flemmi and the FBI even before the death.

**<u>Conclusion</u>**

It is clear that both sets of plaintiffs knew of or, through the exercise of reasonable diligence, should have known, the basis for their claims more than two years prior to presenting the administrative claim. Accordingly, Plaintiffs failure to present their administrative claims within two years of accrual as required by statute, 28 U.S.C. § 2401(b) means the claims are barred. Accordingly, for the foregoing reasons, judgment should be entered for the United States in this matter.

          Respectfully submitted,

          TONY WEST
          Assistant Attorney General

          PHYLLIS J. PYLES
          Director, Torts Branch

          MARY M. LEACH
          Assistant Director, Torts Branch

          /s/ Lawrence Eiser
          LAWRENCE EISER
          BRIDGET BAILEY LIPSCOMB
          Trial Attorneys, Torts Branch
          Civil Division, U.S. Department of Justice
          P.O. Box 888, Benjamin Franklin Station
          Washington, D.C. 20044
          (202) 616-4260; (202) 616-5200 (FAX)

Dated: July 17, 2009          Attorneys for the United States

## **CERTIFICATE OF SERVICE**

      I hereby certify that on July 17, 2009, I caused a true and correct copy of the foregoing **Trial Brief,** to be served by electronic filing to all counsel of record.

                                    /s/ Lawrence Eiser
                                    LAWRENCE EISER