# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Anna M. Litif, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 02-11791-WGY |
| ) | |
| United States of America, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| The Estate of Deborah Hussey, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 03-10087-WGY |
| ) | |
| United States of America, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| The Estate of Debra Davis, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 02-11911 WGY |
| ) | |
| United States of America, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## UNITED STATES' POST-TRIAL BRIEF

### Introduction

On July 24, 2009, this Court entered its tentative findings and conclusions, and requested

post-trial briefs from the parties. The disputed issues remain whether plaintiffs have established,

by a preponderance of the evidence, the required elements of a claim under the Federal Tort

Claims Act, in particular, whether Massachusetts law would hold a private person liable to

plaintiffs in the circumstances of this case. That issue raises the subsidiary questions of (i)

1

whether a tort law duty of care was owed by employees of the FBI to the Davis, Hussey and Litif plaintiffs; (ii) what that duty of care was, i.e., what the FBI was required to do and when; (iii) whether and when that duty was breached; and (iv) whether that breach was a proximate cause of the decedent's deaths on April 12, 1980 (Litif), September 17, 1981 (Davis), and January, 1985 (Hussey).  After the Court identifies the specific conduct of FBI employees alleged to be tortious under the common law of Massachusetts as applied to private persons,[1] it may then question whether (1) the claimed tort duty to act called for conduct by government employees shielded from tort law liability by the discretionary function exception to the FTCA, and (2), whether the plaintiffs' cause of action accrued more than two years before plaintiffs presented their administrative claims on September 10, 2001 (Litif), September 17, 2001 (Davis) and January, 11, 2002 (Hussey).[2]

At the outset of this analysis it is important to note that, despite over seven years of litigation and countless briefs filed, plaintiffs have not cited a case decided under Massachusetts law in which a private person was held liable in tort for the murder of a stranger committed by a third person who was not in the custody or control of the defendant.  Similarly, plaintiffs have not cited a wrongful death case from any state or Federal court in which the statute of limitations was tolled by the discovery rule until the killer was indicted or confessed to the crime.

---

[1]  As noted in the Court's tentative findings, plaintiffs' claim as to what conduct caused the tort law duty to arise has varied.

[2]  Typically, the jurisdictional analysis of the statute of limitations defense proceeds first, *Bolduc v. U.S.*, 402 F.3d 50, 55 (1st Cir. Mass. 2005), however, because of the vagueness of the plaintiffs' alleged cause of action at issue, the structure of the claimed tort needs to be identified first.

1.     **Judgment Should Be Entered for the United States in the Hussey and Davis Cases Because Plaintiffs Fail to State a Cognizable Claim**

Plaintiffs have not established, or articulated, a viable foundation in the law for their "emboldenment" theory of liability.  The FBI had no relationship of any kind with the decedents, and thus, no tort law duty of care was owed.  However, plaintiffs' claim that a duty of care arose as a result of corrupt conduct of FBI employees.  This conduct must be identified before it can be analyzed and it is insufficient for plaintiffs to simply argue, as they have, that certain unspecified acts of the FBI employees caused a tort law duty of care (to everyone) to arise at some point, which was subsequently breached at some point -- which breach was the proximate cause of the deaths of plaintiffs' decedents.   "Liability for negligence requires proof that the defendant 1) owed a legal duty **to the plaintiff**  2) which the defendant breached thereby 3) causing 4) injury to the plaintiff."  *Pine v. Arruda*, 448 F. Supp. 2d 282, 284 (D. Mass. 2006) (emphasis added) (*citing to Davis v. Westwood Group*, 420 Mass. 739, 652 N.E.2d 567, 569 (Mass. 1995).   During trial, the Court and parties focused on the corrupt misconduct of Connolly and Morris which supposedly led to the deaths of Callahan (1982), Halloran and Donahue (1982), and McIntyre (1984) as that which may have created a tort law duty to act upon the FBI.[3]  As the Court stated the issue: "Now, if I was fixated on anything it's on this Callahan murder, because the accomplice nature of Connolly is so appalling really.  But who is it foreseeable that they would murder next?"  Transcript of Court's Tentative Findings, July 24, 2009, p. 90.

The asserted theory of tort law liability articulated by plaintiffs was as follows: While the

---

[3]  Plaintiffs alternately maintained that their tort law theory extended all the way back to the conduct of FBI Agent Paul Rico in 1966, notwithstanding that there is nothing in the record to connect the proven corrupt misconduct of Connolly and Morris to the alleged corrupt conduct of Agent Rico.

FBI had no relationship of any kind with Debra Davis or Deborah Hussey, and thus owed no tort

law duty of care to them, a duty arose on the part of Connolly and Morris, or others in the FBI,[4]

in 1982 (or some point) to disclose alleged FBI corruption and misconduct in such a way as to

prevent the subsequent deaths of Davis and Hussey.  Plaintiffs identified Section 321 of the

Restatement as the most probable legal foundation for this novel tort.  That section suggests that

a defendant who creates a dangerous condition is obligated to act to ameliorate the hazard to

foreseeable victims of the danger.[5]

Massachusetts has not adopted Section 321,[6] nor could it do so on the facts of this case

because it would contravene a long-standing principle of Massachusetts law that "there is no duty

to protect another from the criminal conduct of a third party."  *Kavanagh v. Trustees of Boston*

---

[4]  This part of plaintiffs' theory, i.e., that the FBI supervisors should have supervised the agents in such a way as to have discovered the corruption, and therefore a tort law duty to act arose upon them, is barred by the discretionary function exception of the FTCA, which exempts the United States from claims arising from alleged negligent supervision. *Bolduc v. United States*, 402 F.3d 50, 61 (1st Cir. Mass. 2005) ("[T]he development and management of a supervisory model is a matter of agency discretion. *Attallah* illustrates the point. There, we held that supervisory decisions of the Customs Service concerning the oversight of customs agents were discretionary in nature.") (*citing to Attallah v. United States*, 955 F.2d 776, 783 (1st Cir. P.R. 1992); *accord, K.W. Thompson Tool Co. v. United States*, 836 F.2d 721 (1st Cir. 1988).")

[5]  A fundamental flaw of this theory is that the alleged duty, for it to be at all effective at preventing the deaths of the plaintiffs' decedents, would have to encompass reporting the FBI agents' past corruption in such a way as to cause the arrest, prosecution, conviction and incarceration of Bulger and Flemmi so that they would not be free to commit the murders of Davis and Hussey.  Stating the duty in this way reveals the substantial proximate cause hurdles involved in the theory but more importantly, as a legal matter, the tort law duty at issue cannot include the duty to report a crime to law enforcement because, as even plaintiffs argued in their trial briefs, "Massachusetts law does not recognize a duty to report a crime to law enforcement, let alone 'the violent and criminal history and propensities' of another person." (*citing to Commonwealth v. Senior*, 454 Mass. 12 (2009)). Hussey Plaintiffs' Motion in Limine on Comparative Negligence at p.2.

[6]  See United States Trial Brief on the Inapplicability of the Section 321 (Docket #224)

*University,* 795 N.E. 2d 1170 (Mass. 2003); *Mosko v. Raytheon Co.*, 622 N.E.2d 1066

(Mass. 1993). Even if Massachusetts had adopted Section 321, it would not provide a foundation

for liability because, as was argued at trial, a person is not a condition. The cases relied on by

plaintiffs founded that are founded on Section 321, deal with dangerous conditions – a fire, a

hazard dropped onto an icy road – each of which would bring immediate harm to a discrete and

identifiable group of foreseeable victims and, as a result, a specific duty to act. Here, the

interposition of human agency and criminal conduct and the long passage of time between the

alleged breach (whenever and whatever it was) and the deaths negates any applicability of

Section 321. There is no logical way to connect Connolly's breach of his tort law duty in 1982

(or at some earlier point), to Flemmi's murder of Davis in 1981 or Hussey in 1985 because

"conduct is a proximate cause of death if the conduct, by the natural and continuous sequence of

events, causes the death and without which the death would not have occurred." *Commonwealth*

*v. Carlson*, 447 Mass. 79, 83 (Mass. 2006). Here, there are too many intervening events and

choices made by all of the actors involved for the Court to find that the deaths would not have

occurred had the FBI not breached the asserted duty in 1982 (or earlier).

   In its tentative findings, the Court found that even if a tort duty of care did arise at some

point, that duty could not encompass the Davis and Hussey decedents because it was not

reasonably foreseeable to the FBI that Flemmi would kill Davis or Hussey. Transcript of Court's

Tentative Findings, July 24, 2009, p. 33. This finding is well-established in the facts of the case

and the law of Massachusetts. The Court correctly found that Flemmi and Bulger committed

both murders for personal reasons unrelated to the FBI, and unforeseeable to the government.

"There is no duty owed when the risk which results in the plaintiff's injury is not one which could

be reasonably anticipated by the defendant." *Glick v. Prince Italian Foods of Saugus, Inc.*, 25

Mass. App. Ct. 901, 902 (1987); *see also, Schmid v. National Bank of Greece, S.A.*, 622 F. Supp.

704, 712 (D. Mass. 1985), *aff'd.* 802 F.2d 439 (1st Cir. 1986); Restatement (Second) of Torts §

314A, comment e (1964) (a defendant is "not required to take precautions against a sudden attack

from a third person which he has no reason to anticipate . . . ."). In making this finding, the

Court echoed the words of Justice Cardozo in the *Palsgraf* case:

> The orbit of the danger as disclosed to the eye of reasonable vigilance would be
> the orbit of the duty. One who jostles one's neighbor in a crowd does not invade
> the rights of others standing at the outer fringe when the unintended contact casts
> a bomb upon the ground. The wrongdoer as to them is the man who carries the
> bomb, not the one who explodes it without suspicion of the danger. Life will have
> to be made over, and human nature transformed, before prevision so extravagant
> can be accepted as the norm of conduct, the customary standard to which behavior
> must conform.

*Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 343, 162 N.E. 99, 100-01 (1928).

The failure of foreseeability ends the legal analysis of the Hussey and Davis claims and

one need not analyze further whether the claimed tort duty was breached, and the even more

complicated and implausible question of whether the identified breach of duty, whatever it was

and whenever it occurred, was the proximate cause of the Hussey and Davis deaths.

Alternatively, plaintiffs argue their claim is founded on Section 315 of the Restatement,

by which a tort law duty of care arises as a result of the informant relationship between Flemmi

and Bulger on the one hand, and Connolly and Morris of the FBI on the other. A law

enforcement agency's relationship with an informant does not fit the requirements of § 315,

which is founded on a relationship whereby the defendant has custody or control over the third

person. As the Court noted during trial, an informant is not in the custody or control of law

6

enforcement. "Traditionally, parent-child, master-servant, and possessor-licensee relationships fit into this taxonomy." Restatement § 315.

In an effort to stretch § 315 to encompass the facts of this case, plaintiffs argue that once the informant relationship became "corrupted," a duty of care to prevent harm to the entire general public arose. While the overbreadth of this duty is obvious on its face,[7] the duty would need to be this overbroad to encompass Davis and Hussey, who had no relationship of any kind with the FBI. However, even stretched beyond the bounds of the law as it exists, § 315 would still not provide a foundation for liability because even if a legal duty to act arose, it was not foreseeable that Flemmi would kill Davis or Hussey.

Finally, plaintiffs analogized their claim to that presented in *Irwin v. Ware*, 392 Mass. 745 (Mass. 1984), in which a municipality was held liable in tort, pursuant to a state law, for the failure of a police officer to remove an intoxicated driver from the road. That case provides no assistance to the plaintiffs because the applicable standard in the instant case is private person liability, not that of police officers or municipal liability.

> The extent that the federal government has accepted liability under the F.T.C.A. is 'if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' Whatever liability the Commonwealth may have chosen to assume for itself as a matter of governmental policy has no bearing on the liability of Massachusetts private persons, the standard the federal government accepted.

*Di Mella v. Gray Lines of Boston, Inc.*, 836 F.2d 718, 720 (1st Cir. Mass. 1988); *see also, United States v. Olson,* 546 U.S. 43, 44 (U.S. 2005)*,* ("We here interpret these words to mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local

---

[7] "A duty to all is a duty to no one." *Babcock v. Mason County Fire Dist. No. 6*, 30 P.3d 1261, 1267 (Wash. 2001).

7

law would make a 'private person' liable in tort. And we reverse a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver simply upon a finding that local law would make a 'state or municipal entit[y]' liable."); *McCloskey v. Mueller*, 385 F. Supp. 2d 74, 82 (D. Mass. 2005) ("In the context of an FTCA claim, a legal duty of care exists where there is some relationship between the governmental employee[s] and the plaintiff to which state law would attach a duty of care in purely private circumstances.").

## 2.    The Hussey and Davis Claims Are Barred by the Statute of Limitations

The FTCA expressly provides, in pertinent part, that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues...." 28 U.S.C. § 2401(b).

The Hussey and Davis cases are founded on what the First Circuit has called the "emboldenment theory" of liability, whereby liability arises from the FBI's alleged failure to prevent Bulger and Flemmi from inflicting harm on the plaintiff. *McIntyre v. United States*, 367 F.3d 38, 54 (1st Cir. Mass. 2004). A series of decisions by this Court and the First Circuit,[8] made it clear that any such claim based on the emboldenment liability theory, as are the instant claims, filed after May 11, 2001, is time-barred. Application of the discovery rule to a wrongful death claim under the FTCA is straightforward: "[O]utside the medical malpractice context, the proper subject of knowledge for accrual purposes under the FTCA is (1) the fact of injury and (2) the injury's causal connection with the government." *Skwira v. United States*, 344 F.3d 64, 77 (1st

---

[8] *See, e.g., McIntyre v. United States*, 367 F.3d 38 (1st Cir. Mass. 2004); *Estate of Barrett v. United States*, 462 F.3d 28 (1st Cir. Mass. 2006); *Callahan v. United States*, 426 F.3d 444 (1st Cir. Mass. 2005); *Rakes v. United States*, 442 F.3d 7 (1st Cir. Mass. 2006); *Bennett v. United States*, 429 F. Supp. 2d 270 (D. Mass. 2006).

Cir. Mass. 2003).  The Hussey and Davis claims were filed well the May 11, 2001 cut-off date by

plaintiffs who had knowledge of the fact of their injury and the causal connection with the

government more than two years earlier.

In *Rakes*, the Court examined the same emboldenment theory advanced by the instant

plaintiffs.  "In this case, the plaintiffs' claims against [the U.S.] are based in part on the free reign

that Bulger and Flemmi enjoyed to further the interests of the Winter Hill gang."  *Rakes v. United

States* 442 F.3d 7, 12 (1st Cir. Mass. 2006).  The Court then analyzed in detail the extensive

media coverage of the alleged corrupt relationship between Bulger, Flemmi and the FBI going

back to 1988, which included several articles reporting that the corrupt relationship was such that

Flemmi and Bulger were free to commit murders with impunity.  For example,

> On January 7, 1998, the Herald reported in an inside story that 'Winter Hill
> wiseguy and FBI informant Stephen 'The Rifleman' Flemmi said he was rewarded
> for his work for the agency with a free pass on murder, attempted murder and
> fugitive charges in the mid-1970s, defense lawyers alleged yesterday.' Ralph
> Ranalli, *Mobster: I had a License to Kill; Flemmi says FBI Knew He Was a
> Murderer*; Boston Hearld, Jan. 7. 1998 at 6.

*Id*. at 15.

The *Rakes* plaintiffs, much like the other time-barred plaintiffs, argued that accrual of

their claims should have been tolled, at a minimum, until September 15, 1999, when Judge

Wolf's Salemme decision detailing the FBI corruption was published.  *Rakes,* 352 F.Supp. 2d at

73-74.  Those plaintiffs also claimed that they had not read or did not recall reading the many

newspaper articles cited by the United States.  *Id.* at 77.   However, this Court ruled that the

plaintiffs had sufficient notice of their claims, based on widespread media publicity before

September 15, 1999, to trigger accrual well before the opinion in *Salemme* was published.  In

reviewing and affirming the dismissal of the *Rakes* and *Dammers* claims, the First Circuit held:

> Connolly's corrupt relationship with the FBI received widespread publicity prior to May 11, 1999, the date two years before the date on which the plaintiffs filed their claims.  On the basis of this publicity, we have no difficulty in concluding that Rakes and Dammers should have filed their administrative claims earlier, and that by not doing so they lost the opportunity to present those claims, which are now 'forever barred.'

*Rakes v. United States*, 442 F.3d 7, 22 (1st Cir. Mass. 2006).

Accordingly, because the Court has found that the corrupt FBI relationship was common knowledge via media publicity sufficient to bar claims filed on May 11, 1999, this reasoning would bar the claims filed by the instant plaintiffs, all of whom had knowledge regarding Flemmi's involvement in the deaths of their decedents (though they did not disclose it to law enforcement) far superior to that of any of the time-barred plaintiffs, whose claims were filed earlier.  The Litif and Davis administrative claims were filed four months *after* the time-barred Rakes claims and the Hussey claim was filed eight months *after* the Rakes claims.

Therefore, under an objective standard, Plaintiffs are to be charged with knowledge of at least a portion of the scores of articles published in local newspapers – easily available to Boston-area residents such as these plaintiffs and their extended family members – that concerned the district court hearings in *Salemme* about the corrupt relationship between the FBI and Bulger and Flemmi.  Flemmi's  known historical association with Davis and Hussey, along with the suspicious circumstances of their "disappearance" (which caused members of both families to believe early on that Flemmi had killed them), together with almost-daily reporting from 1997-1998 on Flemmi's claims that the FBI had effectively given him and Bulger free reign to engage in a decades-long crime spree, including murders, provided these plaintiffs all the knowledge required, i.e., knowledge of (1) their injury and (2) the causal connection of the injury to the government – to begin accrual of their claims well more than two years before the claims

were filed in September of 2001 and January of 2002.[9]

In an effort to avoid the statute of limitations bar, the Davis and Hussey plaintiffs make an argument that would toll the statute of limitations well beyond the date of the *Salemme* opinion (which the First Circuit has held is a date too far) to the date the killers of their decedents were indicted (Davis) or confessed to the crime (Hussey) because their claims would not have succeeded until that date.  The most striking aspect of this argument is that plaintiffs have failed to cite a *single* case, from this or any jurisdiction, which supports their unprecedented evasion of limitations law.  Moreover, there is ample binding case law support for the contrary conclusion. *See, e.g., Rakes v. United States*, 442 F.3d 7, 20 ("We note that a claim can accrue before the plaintiff knows that the injury was the result of a breach of a legal duty; it is for this reason that we speak of the plaintiff's knowledge of the 'factual basis' and not of his knowledge of the legal sufficiency of the claim.); *Skwira v. United States*, 344 F.3d 64, 84-85, (1st Cir. Mass. 2003) ("a plaintiff is not entitled to wait until all of the facts in support of the claim are known."); *Gonzalez-Bernal v. United States*, 907 F.2d 246, 248-249 (1st Cir. P.R. 1990) (Plaintiff's claim that statute of limitations should be tolled until the indictment of the killers because they had no way of knowing their decedent was killed by Customs agents earlier is rejected.); *Cutting v. United States*, 204 F. Supp. 2d 216, 224-225 (D. Mass 2002), ("[A]ccrual may occur long before

---

[9]  Plaintiffs argue that their specific knowledge that Flemmi had killed their decedents plus the media articles may have put them on inquiry notice but had they inquired further, they would have been rebuffed by the government.  This two-step is not part of the law.  These plaintiffs had all the information required – a factual basis of the claim – and thus the tolling of the discovery rule ended and accrual began upon the release of the information regarding the corrupt relationship with the government.  In these circumstances, the accrual clock starts and plaintiffs' speculative claims about what might have occurred had plaintiffs inquired further (which they did not) cannot serve to stop or rewind it.

there is a firm confirmation of the defendant's probable culpability.")

The Hussey Plaintiffs argue that, because there was no mention of Deborah Hussey in the avalanche of media coverage or the Salemme opinion, her death at the hand of Stephen Flemmi was inherently unknowable until the confession by the killers. The Davis Plaintiffs, whose knowledge that Flemmi killed Debra Davis shortly after the murder is a matter of public record,[10] speculate that even if a duty to inquire had arisen, such an inquiry would have been fruitless because the government had no conclusive information about the killing until the Flemmi confession. These arguments add elements to the statute of limitations analysis that the First Circuit has not adopted. These plaintiffs claim accrual occurs not at the time a reasonable plaintiff knows of both the injury and causal connection to the government – the two elements set by the Court – but add a third element, which is that the plaintiff must know that the claim will succeed. Adding this step to the analysis would "go far to eliminate the statute of limitations as a defense separate from the denial of breach of duty" and for that reason has been rejected. *United States v. Kubrick*, 444 U.S. 111, 125 (1979).

Moreover, the arguments of both plaintiffs collapse upon consideration of an important fact – the Davis and Hussey families were not innocently ignorant of Flemmi and his conduct. As the trial testimony of Olga Davis and Marion Hussey confirmed, both families were intimate accomplices and beneficiaries in Flemmi's life of crime and reasonably believed he had killed

---

[10] *See e.g.,* Shelly Murphy, <u>Search for Flemmi's ex-girlfriend; Police to look for her remains beneath Roxbury building</u>, THE BOSTON GLOBE, December 11, 1998, ("[Victor Davis] said the family immediately suspected Flemmi had killed her"); Joe Heaney and Ann Donlan, <u>Cops plan search for body in cellar of old mob hangout</u>, THE BOSTON HERALD, December 10, 1998, ("'What bothers me most is wondering whether my Debbie was alive when they buried her and how anyone could be so brutal to kill an innocent kid who did nothing to them?' said Olga Davis.") Trial Exhibit 113.

their decedents shortly after the murder. The only additional step required for accrual analysis is knowledge that the murder may have been connected to the government corruption, which knowledge came in waves of media articles from 1988 through 1997, as reflected in Trial Exhibit 113, and as analyzed by this Court and the First Circuit in *Rakes* and related cases.

If the Court were to consider plaintiffs' argument that accrual should be tolled because the claim would have been denied and/or further investigation would have been unsuccessful, the Court should also consider the factors that would have thwarted any further investigation – the failure of the Hussey and Davis families to report to law enforcement what they actually knew of Flemmi and his involvement with the decedents.  Had they done so in a timely matter, the success of an investigation into Flemmi's involvement in these murders would have surely changed.  In essence, these plaintiffs argue that their nurturing and protecting of Flemmi before the murders, and their silence and inaction after the murders, is somehow a virtue on which they now rely to argue that the essential facts of the murder were unknowable (to the general public) at the critical times, thereby saving their claims from the limitations bar.  As a matter of law and public policy, the Court must reject this argument.

A.      **The Suit Filed by the Family of Deborah Hussey is Time-Barred**

Deborah Hussey was killed by Bulger and Flemmi in January 1985.  The administrative claim based on her death was filed on January 11, 2002.  Marion Hussey and Deborah Hussey's siblings lived in the Boston area.  Mrs. Hussey testified that she lived with Stephen Flemmi as common law husband and wife from 1960 to 1982, though he contended in his trial testimony that the relationship continued up until he went to jail in 1995.  Marion Hussey bore three children by Flemmi.   She was aware of his criminal activities and was a beneficiary of his

13

criminal enterprises.

Marion Hussey did not dispute that she read the media accounts stating that her common law husband had been an FBI informant and was a serial killer.  Thus, the Hussey plaintiffs do not dispute that the second element of the accrual analysis, government connection to their injury, was established by the media barrage in 1997-1998.   They claim, however, that since the body of Deborah Hussey was buried in an unmarked grave, and Flemmi denied the killing until his confession in 2000, then the first element of the analysis, knowledge of the injury, fails.  The Hussey plaintiffs claim that a reasonable person, with the knowledge available to the Hussey family, would not have suspected that Flemmi killed Deborah Hussey until Flemmi confessed to the murder.  They make this claim notwithstanding that Marion Hussey, who knew Stephen Flemmi perhaps better than anyone, did in fact believe that Stephen Flemmi murdered Deborah Hussey, and as she testified in trial, even said this to him.   Plaintiffs now assert that this belief, though true, was unreasonable, and that her later claim to believe that Deborah was not dead, though wrong, was reasonable.

Even if the Hussey plaintiffs could convince the Court that Marion Hussey's belief in 1986 that Stephen Flemmi killed Deborah Hussey was unreasonable, though true, and credits her subsequent claims of ignorance, Plaintiffs' argument still cannot succeed.  They claim that even the police did not know who killed Deborah Hussey before Weeks and Flemmi confessed so, therefore, it is reasonable for Marion Hussey to not believe it.   However, plaintiffs argument fails because the lack of information about the killer among law enforcement regarding Deborah Hussey's death was a result of the inaction and overt protection of Stephen Flemmi's role in the disappearance and death by Marion Hussey and her family.

Marion Hussey, Stephen Flemmi's common law wife of 30 years, testified about the suspicious circumstances surrounding Deborah Hussey's disappearance in late 1984 (her disclosure of an improper sexual relationship with Flemmi), and the fact that she had not heard from her daughter in more than two years, led her to conclude in 1986 that Flemmi had killed her.  That knowledge did not cause her to file a report with the police or any other official authority at the time.  She remained mute, just as she had throughout Flemmi's life of crime with her, to protect him and herself.  To salvage her claim in this case, Marion Hussey testified that she later disbelieved her initially-correct conclusion that Flemmi killed Deborah and alighted on the notion that Deborah was living elsewhere.  She asked Joseph Saccardo, a friend and police officer, to informally look for Deborah, though, as he testified in this trial, she failed to tell Saccardo of the emotionally traumatic last events before Deborah's disappearance.

Mr. Saccardo described the efforts he took to locate Deborah.  His investigation found no trace of Deborah anywhere, though he learned from his sources that his questions about her did cause much concern among Flemmi's gang in South Boston.  As he testified to this Court, his investigation, combined with the suspicious circumstances of her family relationships (even absent knowledge of the sexual disclosure) led him  – a reasonable person in the position of Marion Hussey, though with far less knowledge than her– to conclude that Deborah Hussey was dead.  That was in 1986.   Certainly the fact that no one heard from Deborah at all for the next 15 years would have provided no basis for disbelieving that conclusion.  In fact, each passing month and year in which the family continued to hear nothing from Deborah would be additional proof that Marion Hussey's initial conclusion was right – that Stephen Flemmi had killed her.  And yet Marion Hussey and her family did nothing to initiate an investigation or to even file a missing

15

persons report.  At any time.  So the fact that law enforcement did not know the killer until

Flemmi confessed was a direct result of the Hussey family's failure to report what they knew to

be true as far back as 1986.

While Marion Hussey may wish to bury her head in the sand, the facts and law do not

allow it.

**B.     The Suit Filed by the Family of Debra Davis is Time-Barred**

Debra Davis was killed by Bulger and Flemmi on September 17, 1981.  Her

administrative claim was received on September 17, 2001.  Olga Davis resided in Boston area

from the time she was two years old.  Deposition/Trial testimony of Olga Davis, p. 6-7.  So too,

have her children, the other statutory beneficiaries.[11]  *Id*., p. 7-18.  Moreover, she grew up with

Stephen Flemmi and was well aware of his criminal lifestyle.  *Id*., p. 39-40, 47.  She even

suspected that he had killed her first husband Edward Davis in 1975, and her son Ronald Davis

on March 17, 1981, after each had voiced objections about Flemmi's relationship with Debra

Davis.  *Id*., p. 47, 59-65, 188-191.  She was well aware of the media publicity regarding the

Flemmi-FBI scandal because she and her family were quoted in several articles.[12]

---

[11]  The knowledge of any family member is imputed to the estate's administrator.  *Cutting v. United States*, 204 F. Supp. 2d 216, 227 (D. Mass. 2002);   *Bennett v. United States*, 429 F. Supp. 2d 270, 278 (D. Mass. 2006) ("Thus the discovery rule does not require recalculation of the statute of limitations in light of the subjective knowledge, or ignorance, of each potential plaintiff. The [discovery rule] exception [to the general accrual rule] applies only when the cause of action is inherently unknowable,' . . . not when it merely happens to be unknown by a particular potential plaintiff.").

[12]  Joe Heaney, Lost woman's kin need Mob answers; Flemmi's girlfriend vanished without a trace 17 years ago, THE BOSTON HERALD, December 10, 1998, Exhibit 6;  Shelly Murphy, Search for Flemmi's ex-girlfriend; Police to look for her remains beneath Roxbury building, THE BOSTON GLOBE, December 11, 1998, Exhibit 7; Joe Heany and Ann Donlan, Cops plan search for body in cellar of old mob hangout, THE BOSTON HERALD, December 10, 1998, Trial Exhibit 113.

The Davis family argues that, while they may have suspected that Flemmi killed Debra, if they had filed a lawsuit before Flemmi's confession, it would have been dismissed and perhaps caused them to incur Rule 11 sanctions.  This argument misapprehends the process of asserting a claim under the FTCA.  A lawsuit alleging a cause of action under the FTCA cannot be filed until after the filing of an administrative claim.  The purpose of this requirement is to trigger an *investigation* of the claim.  28 U.S.C. § 2401. Here, of course, the Davis plaintiffs did not present their administrative claim until September 17, 2001, thirty years to the day after she was last seen.  Similarly, while Olga Davis did file a missing persons report with the Randolph Police Department, she failed to tell them the important fact that the last person Debra was seen with before her disappearance was none other than Stephen "The Rifleman" Flemmi.[13]  Other than filing this one report, Olga Davis did nothing.  She did not follow-up with the Randolph Police Department, nor did she make any additional reports as the days and months passed, though she did continue to accepts gifts, including a motor vehicle, from Flemmi in the ensuing years.

When the FBI subsequently initiated talks with Olga Davis about her daughter's disappearance (as part of their investigation of the drug dealing by Mickey and Steven Davis), she also declined to tell them the last person Debra was seen with was Flemmi.[14]  She further testified to her irritation that they kept asking about Stephen Flemmi and their suggestion –

---

[13]  Q: Did you tell the Randolph police that the last person that Debra was known to be with before her disappearance was Stephen Flemmi?
A: No.  I didn't say nothing.
Deposition/Trial testimony, Trial Exhibit 1, p. 102-103

[14]  Q: But you didn't tell them that the last person she was seen with was Steve Flemmi?
A: I don't remember saying that.
Deposition/Trial testimony, Trial Exhibit 1, p. 107.

obvious to a reasonable person with the facts then available – that Flemmi may have killed her

(as Victor Davis believed immediately).  *Id.* p. 109.  As a result, Olga Davis refused to continue

to talk to them.

> Q:     So when they would, in these subsequent meetings when they would ask
>        you these questions about Stephen Flemmi, you were getting irritated, I
>        think.  Is that fair to say?
> A:     That's fair to say.
> Q:     And you told them that you don't know anything about Stephen Flemmi; is that
>        right?
> A:     Well, I didn't.
> Q:     But that's what you told them?
> A:     Yeah.

\* \* \*

> Q:     It also says that Agent Cronin says that Olga Davis – that you told him that you
>        thought that Flemmi had killed your husband years prior to --
> A:     I never said that to the FBI, never, never, never never did I.  They stopped seeing
>        me because I wouldn't say anything.

Olga Davis Deposition/Trial Testimony, Trial Exhibit 1, p. 107, 180

This testimony, in the context of the other relevant facts,[15] makes it clear that, but for the

failure of Olga Davis and her family to come forward to the police with what they knew about

Flemmi's role at the time of Debra Davis disappearance (which would have also been self-

incriminating), the ensuing events would have transpired much differently.  They failed to do so,

like Marion Hussey, to protect Flemmi and themselves.  The Davis family now relies on the

ignorance of the facts available to law enforcement – when they were withholding those critical

facts themselves.

Both the Davis and Hussey families believed early on that Flemmi was responsible for the

deaths of their decedents.  That alone is sufficient to trigger accrual upon the deluge of media

---

[15] For example, Flemmi testified in this trial that Steven and Mickey Davis were drug
dealers who were ordered to pay rent to Flemmi and Bulger and, further, that Mickey Davis had
traveled with him to Haiti in 1981.

articles in 1997 asserting that the FBI had given Flemmi a license to murder.[16]  Both sets of plaintiffs knew of the basis for their claims more than two years prior to presenting the administrative claims.  Accordingly, Plaintiffs failure to present their administrative claims within two years of accrual as required by statute, 28 U.S.C. § 2401(b) means the claims are barred.

**3.      The Claim of the Litif Plaintiffs Is Clearly Time-Barred**

In its tentative findings, the Court found that Louis Litif was killed by Bulger in 1980 as a result of a leak of his FBI informant status by John Connolly to Bulger.  While this claim at least contains the fundamentals for a valid tort claim,[17] i.e., Connolly breached a duty to Litif by allegedly leaking his name shortly before he was killed, that frame fatally sinks the claim under the bar of the statute of limitations.   Every element of this claim – including the theory that Litif was killed by Bulger as a result of his cooperation with the government, which was leaked to Connolly by Attorney Curry – was detailed repeatedly in public media articles published more than two years before the filing of the administrative claim.  See, e.g., Ralph Ranalli, Feds hoping for a hit from mobster's info on murders, THE BOSTON HERALD, July 20, 1998; Ralph Ranalli, Questions arise over FBI agent's knowledge of slaying, THE BOSTON HERALD, Aug. 5, 1998 ("Rogue FBI agent John Connolly was told of a South Boston drug dealer's intention to become an informant shortly before the dealer was allegedly killed by South Boston crime boss

---

[16]   Indeed, Flemmi testified that he told Debra Davis of his corrupt relationship with the FBI before he killed her in 1981, and that she repeated this fact in front of one of her brothers before her death.  So, the Davis family was on notice of the corrupt relationship between Flemmi and the FBI even before the death.

[17]    Though the inferential leaps necessary to reach this finding are substantial. Det. Lt. Johnson testified at trial that despite full investigations of the Litif murder in 1980 and again in 1997-2000, there was insufficient evidence to charge anyone with Litif's murder.

and FBI snitch James "Whitey" bulger, the Herald has learned.  The revelation that Connolly –

branded as an agent out of control by federal prosecutors – knew Louis Litif's intentions prior to

his death makes Litif the second informer allegedly murdered by Bulger after his status was

allegedly leaked to Connolly, his FBI "handler.'");  Howie Carr, <u>Mr. B. should be ashamed for

more than Carlin gaffe</u>, THE BOSTON HERALD, Aug. 6, 1998 ("Yesterday, we heard from the

lawyer of the late bookie, Louis Litif.  Two weeks before Louis turned up dead in the trunk of his

car, the lawyer says he told Eddie Walsh about Louis' intention to 'cooperate' with the

authorities.  He also said Johnny Connolly was standing nearby."); Ralph Ranalli, <u>Ex-FBI agent

claims slain dealer was informer</u>, THE BOSTON HERALD, Aug. 6, 1998 ("Former agent John

Connolly was responding to a Herald story yesterday reporting that drug dealer Louis Litif, 45,

was killed less than two weeks after a local attorney told Connolly and Boston police detective

Edward Walsh that he was planning to turn state's evidence."); Peter Gelzinis, <u>From Johnny, to

Whitey: Best Wishes!</u> THE BOSTON HERALD, Aug. 11, 1998 ("Last week, a lawyer for the late

Louis Litif, bookie and aspiring drug dealer who perished in a Southie barroom, admitted his

client contemplated rolling over on Whitey Bulger.  The lawyer said he told this to an old Boston

cop in the company of Johnny Connolly...two weeks before Louis' demise.")  Trial Exhibit 113.

      As both Anna and Luanne Litif testified at trial, the newspaper articles concerning Bulger

and Connolly's alleged roles in the Litif murder, coupled with the publicity surrounding Judge

Wolf's hearings in *Salemme*, gave them the factual basis for their administrative claim to the

FBI.  The fact that they did not read the articles until years after publication does not save their

claims from the time bar.  The First Circuit has established that these cases involve what the

plaintiffs "should have known."  *Rakes*, 442 F.3d at 20.  The "trail of newspaper articles" from

June 1997 to September 1998 are the foundation for the application of the proper accrual

analysis.  *Id*. at 22.  While plaintiffs are not expected to read every article, the United States is "entitled to expect that, through the channels of communication that run among people connected through ties of neighborhood, community, friendship and family, the general purport of these important and widely circulated articles would become known."  *Id*. at 23.

Indeed, as early as 1980, the Litif plaintiffs were on notice that Louis Litif had criminal connections with James Bulger and a relationship with the FBI.  *See*, Peter Gelzinis and Paul Corsetti, THE BOSTON HERALD, May 4, 1980 ("Litif was a bookmaker obsessed with a fatal urge to broaden his horizons by dealing in drugs, trading information with the FBI and using his .357 magnum to settle petty squabbles inside his South Boston bar...Litif eventually became a key figure in an operation controlled, according to police sources, by James J. 'Whitey' Bulger, Jr., 50.").  This knowledge, combined with the swarm of media articles that followed during the *Salemme* proceedings, clearly established that the Litif claim accrued, under any theory of liability, long before September 10, 1999, the date two years before the claim was actually filed.

///

///

///

///

21

4.      **Conclusion**

Accordingly, for the foregoing reasons, judgment should be entered for the United States

in this matter.

                                        Respectfully submitted,

                                        TONY WEST
                                        Assistant Attorney General

                                        PHYLLIS J. PYLES
                                        Director, Torts Branch

                                        MARY M. LEACH
                                        Assistant Director, Torts Branch


                                        /s/ Lawrence Eiser
                                        LAWRENCE EISER
                                        BRIDGET BAILEY LIPSCOMB
                                        DANIEL BAEZA
                                        Trial Attorneys, Torts Branch
                                        Civil Division, U.S. Department of Justice
                                        P.O. Box 888, Benjamin Franklin Station
                                        Washington, D.C. 20044
                                        (202) 616-4260; (202) 616-5200 (FAX)

Dated: July 17, 2009                    Attorneys for the United States




## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2009, I caused a true and correct copy of the foregoing
**Post-Trial Brief,** to be served by electronic filing to all counsel of record.


                                        /s/ Lawrence Eiser
                                        LAWRENCE EISER